Devon Petersen, Wyo. State Bar #6-4480
Fleener Petersen, LLC
506 S. 8th St.
Laramie, WY 82070
(307) 460-4333
devon@fleenerlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WILLIAM MICHAEL CROTHERS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIDGET HILL, Wyoming Attorney | ) |
| General; and MATT CARR, Teton | ) |
| County Sheriff, as officer who has | ) |
| current custody, | ) |
| | ) |
| Respondents. | ) |

_____

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

_____

COMES NOW, Petitioner William Michael Crothers, and, pursuant to 28 U.S.C. §
2254 and the Rules Governing § 2254 Cases, hereby respectfully petitions this Court for
a Writ of Habeas Corpus. In support of this Petition, Petitioner states the following:

### I. PROCEDURAL BACKGROUND AND JURISDICTION

1) Petitioner is in custody as that term has been construed for purposes of post-
conviction relief. Specifically, Petitioner is under a state court judgment being contested,
and Petitioner is currently free on an appeal bond, under conditions, with pending
concurrent sentences of thirty days to be served.  See *Hensley v. Municipal Court,* 411

U.S. 345 (1973), holding that the custody requirement is satisfied in writ of habeas corpus proceedings where a petitioner remains at large on his own recognizance but is subject to conditions pending the execution of his sentence; See also, *Burris v. Ryan,* 397 F.2d 553 (7th Cir. 1968) (petitioner in "in custody" and entitled to habeas relief when free on bond) and *Capler v. City of Greenville,* 422 F.2d 299 (5th Cir. 1970) (a petitioner released on an appeal bond pending the service of his sentence is "in custody" and thereby entitled to habeas proceedings).

2) A jury trial was held in the Teton County Circuit Court for the Ninth Judicial District for the State of Wyoming, docket number CR-2019-0280, from February 26 to 28, 2020. At the conclusion of the trial, the jury deliberated for over six hours and informed the court they were deadlocked. After the Court instructed the jury to continue deliberating, Petitioner was convicted of two counts of unlawful contact in violation of W.S. § 6-2-501(g)(1) and one count of hosting a house party where minors are present in violation of W.S. § 6-4-406(a). (See Attachment A).[1] On April 11, 2020, Petitioner was sentenced to sixty days in jail, with all but thirty days suspended as to each count. The sentence on each count was ordered to be served concurrently with the other two counts.

---

[1] While Petitioner was convicted of misdemeanors, not felonies, these unlawful misdemeanor convictions have had a devastating impact on Petitioner' life, tearing apart his relationship with his family and community and forever destroying his reputation. Fifteen newspaper articles have been written about Petitioner in the local newspaper. As the Court knows, a President of the United States can be impeached for a misdemeanor conviction. Art. II, Sec. 4, U.S. Constitution. A writ of habeas corpus from this Court is essential for Petitioner to attempt to piece his life back together.

3) Petitioner plead not guilty to all charges against him. He did not testify at trial or any other hearing, although he did answer the questions of law enforcement without an attorney at the beginning of the investigation.

4) Following sentencing, Petitioner was allowed to remain free on an appeal bond. On October 9, 2020, after learning of an email sent by one of the witness's family to the Judge and receiving more emails pursuant to a public records request, Petitioner filed a Motion for New Trial based upon a *Brady*[2] violation, to wit: the State prosecutors failed to disclose communications and meetings with its witnesses wherein the State promised witnesses they would not be charged for any crimes they had committed. (See Attachment B). On April 21, 2021, the Circuit Court denied Petitioners' Motion for New Trial. (See Attachment C).

5) Petitioner then appealed his judgment of convictions to the Teton County District Court for the Ninth Judicial District for the State of Wyoming, Civil Action No. 18307/18485. (See Attachment D). In that appeal, Petitioner was represented by Alan Dershowitz[3], who raised the following issues: 1) *Brady* violation for failure to disclose favorable, material information; 2) due process violation based on prosecutorial misconduct; 3) erroneous exclusion of evidence; 4) abuse of discretion for denying Motion for Change of Judge; and 5) unconstitutional vagueness of the unlawful contact statute.

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).
[3] Because Mr. Dershowitz is not a member of the United States District Court for the District of Wyoming, and this is the initial filing in the case, Mr. Dershowitz is not a signatory to this Petition, but is seeking contemporaneously herewith to be admitted "of counsel" pro hac vice.

6) At the oral argument on appeal, the State made three crucial concessions: 1) witnesses are more reluctant to talk to the prosecutor than to a school resource officer; 2) there is a different level of immunity between a resource officer and a prosecutor; and 3) a prosecutor doesn't have to abide by a resource officer's promise, saying:

> [PROSECUTOR]: So, I think the question relating to immunity is twofold. So, first, we have situations where law enforcement -- and in this case Deputy Roundy -- says to these kids, Look, if you talk about this, you're not going to be charged. Okay. And then there's another issue then when the prosecutor goes to talk with witnesses. They still need to be reluctant to talk to a prosecutor, because they're going to be talking about having committed new crimes. And if the prosecutor at that point says, Look, I'm not going to charge with you any new crimes if you talk to me about this case, that's a different level of immunity.
>
> …So, if a prosecutor is granting immunity with -- to a witness to induce that witness to discuss a case with them, I would submit that that particular immunity does need to be submitted to Defense counsel.
>
> … the record is silent as to whether or not the discussions between the State and these witnesses were ever disclosed to the Defense.
>
> …So, to the extent that the Court inquired whether there was a case law stating that a prosecutor must honor law enforcements' promises or statements made during an interview, I am not aware of any case law in Wyoming that addresses that particular issue. (See Attachment E, pgs. 27-31, 36-37).

The District Court affirmed the judgment of convictions on October 18, 2022. (See Attachment F).

7) On November 1, 2022, following the affirmance of his convictions by the District Court, Petitioner filed a Petition for Writ of Review/Certiorari with the Wyoming

Supreme Court, Docket S-22-0261, on the grounds that the State violated its obligation to disclose exculpatory information under *Brady* and *Giglio v. U.S.*, 405 U.S. 150 (1972). (See Attachment G). On November 22, 2022, the Wyoming Supreme Court denied the Petition. (See Attachment H). No evidentiary hearing was held. All state remedies have been exhausted on the *Brady* claim.[4]

8) No other Petitions for any relief have been filed in Federal Court. Jurisdiction is proper in this Court.

## II. GROUNDS FOR CLAIMS THAT PETITIONER IS BEING HELD IN VIOLATION OF THE UNITED STATES CONSTITUTION

9) To obtain the above convictions, the State of Wyoming prosecutors office violated Petitioner's Fifth and Fourteenth Amendments rights to due process when the prosecutors withheld favorable, material *Brady* evidence from Petitioner prior to trial. Specifically, State prosecutors did not disclose to Petitioner prior to trial that the State's witnesses had concerns about being prosecuted for crimes they themselves had committed, and that State prosecutors met with those witnesses and reassured the witnesses that they would not be prosecuted for crimes.[5]  There is no dispute that these

---

[4] Wyoming does have a statutory post-conviction relief scheme, but it applies only to persons serving felony sentences, and is therefore not available to Petitioner. See W.S. 7-14-101 et. seq.

[5] Since the filing of the Motion for New Trial based on the failure to disclose the prosecutor's promise to witnesses, Petitioner has learned of other *Brady* violations that are also grounds for the issuance of a writ of habeas corpus, including the failure to disclose the following: 1) that the State's main witness received a deferred prosecution from the same prosecutors and was on probation at the time of Petitioner' trial with the ultimate disposition of the deferred prosecution not yet resolved; and 2) other clear *Brady* violations that are currently subject to a protection order. Petitioner is in the process of seeking relief from the strictures of the protection order so that this Court can consider the claims. Petitioner intends to bring those issues in State court at the earliest possible date.

meetings happened, and there is no dispute that these meetings were not disclosed to Petitioner prior to his trial.

10) This case started with a party. In May 2019, Petitioner' teenage son invited several friends over to Petitioner' home in Teton County, Wyoming. (Feb. 27 Transcript at 31). Petitioner was at a charity event at the time and had no knowledge of the gathering at his house. Soon the gathering started to expand, with more than just Petitioner' kids' friends coming over. The teenagers brought alcohol with them, including a 1 ¾ liter bottle of vodka. (*Id.* 74). They also had marijuana. (*Id.* 73-78).

11) Petitioner arrived home later that night, having taken a taxi home, realizing he was inebriated after the evening at the charity gala. (*Id.* 31-32). There were twenty to thirty teenagers when Petitioner walked inside his home. (*Id.* 99). Many of these teenagers were longstanding family friends, whom Petitioner had known since youth. (*Id.* 144-45). But there were several teenagers Petitioner had not met before, including one young woman named K█████ H█████████. (*Id.* 215).

12) Ms. H████████ was inebriated when Petitioner arrived. (*Id.* 219). According to Ms. H██████'s trial testimony, she had been consuming—or, in Ms. H████████'s words, "chugg[ing]"—vodka straight from the bottle. (*Id.* 218). Later that evening, Ms. H███████ told others at the party that Petitioner had kissed her and grabbed her buttocks. (*Id.* 226-27). But none of the partygoers witnessed Petitioner grab Ms. H████████'s buttocks. And Ms. H████████'s boyfriend, R█████ T█████ testified that he did not see the alleged kiss or alleged butt grab, even though Ms. H████████ was sitting on his lap when the alleged kiss occurred. (*Id.* 187).

6

13) Only one witness, W████ O████ claims to have seen Petitioner kiss Ms.

H████. (*Id.* 198-205). Mr. O████ and Ms. H█████ were close friends. Ms.

H████ did not remember being kissed as Mr. O███ described at trial. Despite Ms.

H█████'s allegations concerning the events of the evening, Ms. H█████ decided to

spend the night at Petitioner's house with her boyfriend, after claiming that Petitioner had

kissed her and grabbed her. (*Id.* 227). Ms. H█████ did not seek a ride home, made no

attempt to leave, asked no one for help, and was generally convivial the following day,

expressing no concerns. (*Id.* 188, 227).

14) One month before trial, the State filed an Amended Information and added an

additional count of unlawful conduct against Petitioner based on a second alleged kiss

involving Ms. H█████. Thus, Petitioner went to trial in February 2020, facing a total of

six counts: Count I, Sexual Battery against K███ H█████; Count II, Unlawful Contact

on Ms. H█████ in Petitioner' house; Count III, Unlawful Contact on Ms. H█████ in

Petitioner' garage; Count IV, Unlawful Contact on D███ K███ Count V, Permitting a

House Party Where Minors Are Present; and Count VI, Breach of Peace. Petitioner was

acquitted of sexual battery, one count of unlawful contact, and breach of peace. He was

convicted of permitting a house party where minors are present, one count of unlawful

contact with Ms. H█████, and one count of unlawful contact with D███ K███ a

longtime family friend who Petitioner was accused of kissing on the cheek in a crowded

public space, with only Mr. O███ claiming to have seen it.

15) Following the trial, Petitioner received several concerning emails indicating

that members of the public were emailing the Circuit Court Judge directly about

Petitioner' case. The emails indicated that one of the witness's mother, Julie Kling, believed there to be a "Circuit Court team" composed of law enforcement, the prosecutor's office, victim's advocates, and the Circuit Court itself. After reviewing this communication, Petitioner' made a public records request for other similar emails.

16) Petitioner subsequently obtained several public records through which he discovered that the State's witnesses and their families were concerned about the teenagers' involvement in the case, particularly their own criminal liability for underage consumption of alcohol and possession of marijuana. The witnesses and their families specifically asked Deputy Prosecuting Attorney Allan whether the witnesses would be prosecuted. Prosecutor Allan met with each of the witnesses and reassured them that if they testified against Petitioner, they would not face any criminal liability. Prosecutor Allan never revealed this information to Defense Counsel.

17) The State suppressed favorable impeachment evidence in violation of the United States Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United* States, 405 U.S. 150, 154 (1972). Because this favorable impeachment evidence would have applied to each of the State's key witnesses at trial, there is at least a reasonable probability that, had the evidence been disclosed, Petitioner would not have been convicted.

18) *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United* States, 405 U.S. 150, 154 (1972), require the prosecution to disclose material exculpatory and impeachment evidence as part of a defendant's constitutional right to due process. To establish a *Brady* violation, a defendant must demonstrate that the prosecution (1) the

prosecutor failed to disclose evidence, (2) that the evidence was favorable to the

defendant, and (3) the evidence was material. *United States v. Bagley*, 473 U.S. 667, 675

(1985).

19) Here, the evidence at issue is an email exchange between Prosecutor Allan and

Carrie Kirkpatrick, the mother of one of the State's teenage witnesses. The email chain

starts with Ms. Kirkpatrick emailing Prosecutor Allan her concerns about the teenagers'

liability for their own criminal behavior if they decide to testify against Petitioner.

Specifically, her email stated:

> [I]t seems that several parents are concerned that their kids
> will get in trouble about drinking or illegal behavior during
> the party in question. Is there some sort of statement that
> could be made either in writing or otherwise assuring these
> families that their kids will not be held legally accountable for
> underage drinking, etc., while on the stand for the case? (See
> Attachment I).

20) Prosecutor Allan then responded to Ms. Kirkpatrick's request, reassuring her

that the families and their children will not be held legally responsible for underage

drinking or other crimes:

> I have started the process of meeting with all the witnesses,
> including parents who are interested. We'll reassure them
> about drinking, etc. (See Attachment I).

21) Importantly, Ms. Kirkpatrick's concerns were not without basis. Under

Wyoming law, it is a crime for anyone under 21 to drink or possess alcohol. WY. Stat. §

12-6-101 (b). Further, it is a high misdemeanor for anyone, regardless of age, to consume

or possess marijuana. WY Stat. § 35-7-1031. Thus, Prosecutor Allan was "reassur[ing]"

the witnesses that they would not be charged with a crime, including a high

misdemeanor—the same level offense Petitioner was charged with—if the witnesses took the stand and testified against Petitioner. In other words, Mr. Allan promised the witnesses immunity.

22) This evidence meets all three of the elements for a *Brady* violation. The State suppressed the evidence by not disclosing it to the defense, the evidence is favorable because it could have been used to impeach each of the State's teenage witnesses, and the evidence is material because there is at least a reasonable probability that, had the evidence been disclosed, Petitioner would not have been convicted. The following discussion further explains each of the elements, starting with the State's suppression of evidence.

23) Evidence is "suppressed by the State, either willfully or inadvertently," when it is "known to the [State] but not disclosed to trial counsel." *Fontenot v. Crow*, 4 F. 4th 982, 1062 (10th Cir. 2021) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *see also Alderman v. Zant*, 22 F.3d 1651, 1553-54 (11th Cir. 1994) ("Where the credibility of the witness is an important issue in the case, without which there could have been no indictment and no evidence to carry the case, the prosecutor has a duty to disclose evidence of any promises made by the state to such a witness in exchange for his testimony." (internal citations omitted)).

24) Here, direct and circumstantial evidence shows that the State failed to disclose Prosecutor Allan's promises to the teenage witnesses that they would not be subject to criminal liability for underage consumption of alcohol and possession of drugs if they testified against Petitioner.

25) After discovering the communications from Prosecutor Allan in which Prosecutor Allan reassured the witnesses and their families that they would not be prosecuted for crimes if they testified at Petitioner' trial, Petitioner moved for a new trial based on a *Brady* violation. Defense Counsel Tom Fleener provided an affidavit to support Petitioner' motion for new trial in which Defense Counsel Fleener stated unequivocally that Prosecutor Allan had never disclosed the evidence. Prosecutor Allan responded with an affidavit of his own in which he stated that he was pretty sure that he told call Defense Counsel Fleener that he "agreed with Deputy Roundy's representations" and that none of the "youthful participants at the party would be charged with misdemeanor crimes." (See Attachment I). As an initial matter, Prosecutor Allan provided no documentation or specifics to support this alleged communication with Defense Counsel Fleener.

26) More importantly, Prosecutor Allan never claims that he told Defense Counsel Fleener about his conversations with the teenagers and their parents in which he promised that the teenagers would not be prosecuted; Prosecutor Allan merely claims that he conveyed his subjective intent not to charge. The fact that Prosecutor Allan, separate and apart from SRO Roundy, informed the teenage witnesses that they would not be charged is what is important for *Brady*. Prosecutor Allan never claims to have disclosed the meetings to defense counsel, and, in fact, this information was never conveyed to the Defense.

27) The State asserted two other arguments to combat Defense Counsel Fleener's affidavit and hedge against Prosecutor Allan's nondisclosure. First, the State argued that

the defense already knew about SRO Roundy's promises to the teenagers that they would not get in trouble and thus there was no need to disclose the additional communications from Prosecutor Allan promising the students that they would not be criminally prosecuted for their actions.

28) Second, the State argued that Prosecutor Allan's promises were not technically in exchange for the teenagers' testimony. In other words, the State argued that Prosecutor Allan made a unilateral promise to the teenagers that they would not be held criminally liable; the prosecution would not have pursued charges against the teenagers whether they testified or not. Neither of these arguments are convincing.

29) Turning first to the argument regarding SRO Roundy, a promise by a school resource officer that a high school student will not get in trouble for a weekend of partying is fundamentally different than a promise from a deputy prosecutor that a teenager will not be held criminally liable for underage drinking and possession of drugs if the teenager takes the stand on behalf of the State. A school resource officer is not a prosecutor; they are different legally and as a practical matter. A school resource officer's promise that a student will not get in trouble during a campus interview may well be nothing more than puffery, strategically deployed to extract admissions from the student. The State admitted this at oral arguments on the appeal. (See Attachment E, pgs. 27-31).

30) In contrast, a prosecutor's promise, tacit or explicit, is binding; a prosecutor cannot renege after promising a teenager they will not be charged for blatant criminal activity. Accordingly, the fact that defense counsel was aware of SRO Roundy's representations that the students would not get in trouble does not negate the fact that the

prosecution failed to disclose Prosecutor Allan's promised reassurances that the witnesses would not face any criminal liability if they testified against Petitioner.

31) The State's second argument regarding the technical nature of Prosecutor Allan's promises similarly fails to convince. The State claims that Prosecutor Allan's promises were unilateral in nature, and that the State would not have prosecuted the teenage witnesses regardless of whether they had agreed to testify against Petitioner. But Prosecutor Allan's email exchange with Ms. Kirkpatrick contradicts this assertion. In the email exchange, Ms. Kirkpatrick indicates that several of the witnesses were reluctant to testify out of concern that they would face criminal liability for underage consumption of alcohol and possession of marijuana. She requests that Prosecutor Allan provide a "statement" or other assurance that the witnesses and their families would not be prosecuted. In other words, "promise us immunity and we will agree to testify."

32) In response, Prosecutor Allan indicates that he is in "the process of meeting with all the witnesses" and that he will "reassure" them about "drinking etc." That is, to cure the witnesses' reluctance to testifying against Petitioner, Prosecutor Allan promises the witnesses that they will not face any criminal liability themselves.

33) Put simply, Prosecutor Allan provided the witnesses with an assurance of immunity in exchange for their testimony—a *quid pro quo*, not a unilateral guarantee. *See Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009) (noting that, for purposes of a *Brady* violation, "[a] deal is a deal—explicit or tacit [there] is no logic that supports distinguishing between the two"); *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) ("[E]vidence of *any understanding or agreement* as to a future prosecution would

be relevant to his credibility and the jury was entitled to know of it.") (emphasis added). Further, regardless of the labeling of the exchange, the problem remains: Prosecutor Allan granted a benefit to the witnesses that the State would not prosecute them for any crimes they committed that night, and Prosecutor Allan never revealed this benefit to the defense.

34) The State's response and the Circuit Court's order denying motion for new trial focused heavily on the fact that the Defense cross-examined SRO Roundy on the fact that SRO Roundy had promised the juvenile witnesses that they would not get in trouble if they provided incriminating information about Petitioner. But as described above, the statements from SRO Roundy have no bearing on the Prosecutor's failure to disclose *Prosecutor Allan's* promises to the teenagers that they would not face criminal liability if they testified against Petitioner.

35) The strongest piece of circumstantial evidence indicating that the Defense was not notified of Prosecutor Allan's promises is that the Defense did not cross examine a single juvenile witness about their meetings with the prosecutor. This fact strongly indicates a lack of knowledge on the part of the Defense. *See Fontenot v. Crow*, 4 F.4th 982, 1065 (10th Cir. 2021) ("[T]he most probative evidence relating to the disclosure *vel non* of [*Brady* evidence] is the conspicuous absence of cross-examination … on the matters contained [in that evidence]." (quoting *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 829 (10th Cir. 1995).

36) In sum, direct and circumstantial evidence shows that the State failed to disclose Prosecutor Allan's promises to the teenage witnesses that they would not be

subject to criminal liability for underage consumption of alcohol and possession of drugs if they testified against Petitioner. The State's arguments to the contrary are unconvincing. *See Fontenot*, 4 F.4th at 1064 ("Far from revealing clear and convincing evidence that the [*Brady* evidence] was turned over by the State before trial, the record 'strongly suggests and supports a contrary finding, namely, that the [*Brady* evidence] was not disclosed.'" (quoting *Smith*, 50 F.3d at 829)). The first element of *Brady* is met.

37) Having established that the State suppressed evidence, the next inquiry under *Brady* is whether the suppressed evidence was favorable for the defendant. "Favorable evidence includes impeachment evidence." *U.S. v. Bagley*, 473 U.S. 667, 676 (1985). Further, "[i]n the context of a government witness, this could mean impeachment evidence regarding favorable treatment or even the possibility or expectation of favorable treatment." *Harshman v. Superintendent, State Corr. Inst. At Rockview*, 368 F. Supp. 3d 776, 790 (M.D. PA 2019).

38) Here, Prosecutor Allan promised each of the teenage witnesses that they would not be subject to criminal liability for underage consumption of alcohol and possession of marijuana if they took the stand against Petitioner. As Prosecutor Allan notes in his affidavit, the teenage witnesses were, at first, reluctant to testify because of their own potential criminal liability, but he "immediately reassured [them] that no one would be prosecuted for using alcohol or drugs at the party." This evidence would have been favorable for the defense because it shows that the teenagers had a progovernment bias. It demonstrates that the witnesses themselves faced significant liability and agreed to testify against Petitioner only upon "reassurances" from the deputy prosecutor that

they themselves would not be criminally prosecuted. And it could have been used to impeach the truthfulness and reliability of each of the State's witnesses. For these reasons, the evidence must be considered favorable to Petitioner. The second element of *Brady* is met.

39) The final element under *Brady* is materiality. "Evidence is material under *Brady* only when a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed." A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Brady* does not require that a defendant prove beyond a reasonable doubt or even a preponderance of the evidence that he would have been acquitted at trial had the prosecutorial immunity agreements been disclosed.

40) Here, there is a reasonable probability that Petitioner would not have been convicted had the State's immunity agreements been disclosed. As an initial matter, the State's entire case at trial hinged on the credibility and reliability of the teenage witnesses from the party, all of whom received "reassurances" from the prosecution that they would not be prosecuted for the potential crimes of underage possession of alcohol and possession or use of marijuana. Had the immunity agreements been disclosed, Petitioner' entire trial strategy would have been altered to focus on how the prosecution and witnesses had orchestrated a campaign to bring down Petitioner. To this end, Defendant would have (1) asked questions to prospective jurors during *voir dire* about their ability to weigh the credibility of witnesses whose testimony has been procured by promises by the state; (2) cross-examined the witnesses on the immunity agreements; (3) offered

incriminating evidence to show the extent of the promises not to prosecute and the effect

on the witnesses who received these promises; and (4) proposed a jury instruction

regarding immunized witnesses in accordance with Tenth Circuit case law.

     41) In addition to these steps, had Petitioner known of Prosecutor Allan's

promises to each of the teenage witnesses, Petitioner could have combatted the charge for

hosting a house party where minors were present. Without the promises from Prosecutor

Allan, Petitioner had little to discredit the witnesses on the charge of hosting a house

party and instead had to focus exclusively on the more serious charges of sexual battery

and unlawful contact. The State's cross-examination of the Defense's sole witness

underscores the importance of evidence that a witness has received a benefit by the party

calling the witness to testify. In both the beginning and rebuttal of their cross-

examination, the State impeached J█████ S███, Petitioner' sole witness, for bias

because he had taken a trip to Las Vegas with Petitioner's family. The State then

highlighted its cross-examination during its closing argument. In other words, the State

argued that Mr. S████ had received a benefit in exchange for his testimony.

     42) The Defense did not have this same benefit in cross-examining the State's

witnesses. Had the defense received this same opportunity, the entire dynamic of the case

would have been different. See *Bagley* at 676, ("If disclosed and used effectively, it may

make the difference between conviction and acquittal. The jury's estimate of the

truthfulness and reliability of a given witness may well be determinative of guilt or

innocence, and it is upon such subtle factors as the possible interest of witness in

testifying falsely that a defendant's life or liberty may depend."). Indeed, the defense

could have impeached each of the State's witnesses for pro-government bias. See *Cargle v. Mulliin*, 317 F.3d 1196, 1215 (10th Cir. 2003) ("Like a pending criminal charge or possible probation violation, this threat was 'relevant to show pro-government bias on the part of the testifying witness, on the theory the witness might tailor [her] testimony to please the prosecutor.").

43) Importantly, *Brady* does not require that a defendant prove beyond a reasonable doubt or even a preponderance of the evidence that he would have been acquitted at trial had Prosecutor Allan's promises to each of the State's witnesses been disclosed. Petitioner merely must prove a reasonable probability that it might have made a difference. And here, Petitioner has done just that. The third element for *Brady* is met.

44) As described above, all three elements for *Brady* are met: the Prosecution suppressed evidence; the evidence was favorable to Petitioner; and the evidence was material, *i.e.*, there is a reasonable probability that Petitioner would not have been convicted had the evidence been disclosed. Accordingly, the Prosecution violated *Brady*.

WHEREFORE for the foregoing reasons, Petitioner respectfully requests this Court to:

A. Issue an order directing Respondent to show cause why relief should not be granted;

B. Authorize Petitioner to conduct discovery of facts, witnesses, documents and evidence that will support the allegations of this petition;

C. Conduct a hearing on the allegations of Mr. Crothers' petition;

D. Allow the parties a reasonable time within which to file post-hearing briefs;

E. Issue a Writ of Habeas Corpus granting Petitioner relief from his convictions and jail sentences; and

F. Enter such other order as this Court deems just and equitable.

SIGNED UNDER PENALTY OF PERJURY: I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated December 19, 2022.

Signature of Attorney:

Devon Peen

Devon Petersen, Wyo. State Bar #6-4480
Fleener Petersen, LLC
506 S. 8th St.
Laramie, WY 82070
(307) 460-4333
devon@fleenerlaw.com
Attorney for Petitioner

19